IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JERRY D. SELLERS, )<br>)<br>Plaintiff,  )<br>)<br>v.    )<br>)<br>SAM CLINE, Warden, Hutchinson  )<br>Correctional Facility;  )<br>RAY ROBERTS, Secretary of  )<br>Corrections for the State of  )<br>Kansas, in his official capacity; )<br>JACOB FEARS; ISAAC BAKER;  )<br>CHARLES MITCHELL; and  )<br>STEPHEN JONES,   )<br>)<br>Defendants.  )<br>) | **CIVIL ACTION**<br><br>No.  13-3076 |

### MEMORANDUM AND ORDER

Before the court are the following:

Motion for Summary Judgment by defendants Fears, Baker, Mitchell and Jones (Doc. 89,90)[1];

Plaintiff's Response (Doc. 94); and

Defendants' Reply (Doc. 97).

**I. Summary**

Plaintiff is serving a life sentence for sex offenses relating to minors. He was an inmate at Hutchinson Correctional Facility (HCF) on November 4, 2011. Defendants Fears, Baker, Mitchell and Jones were correctional officers of varying rank at HCF.

---

[1] The court previously granted motions to dismiss by defendants Cline and Roberts, each of whom was sued only in his official capacity. (Doc. 46). Plaintiff subsequently named these defendants in an amended complaint (Doc. 53), but he did not serve them (or the State of Kansas) with the amended complaint and does intend to pursue such claims. See Doc. 86 at 6. All claims against Cline or Roberts are therefore dismissed.

Plaintiff was locked in his cell on the evening of November 4, 2011, while defendant Mitchell, a new officer who was undergoing on-the-job training, remotely opened and closed cell doors from a control panel at the end of the cell run. Mitchell was letting inmates in and out of their cells for a shower period. The practice was for an inmate to call out his cell number to the panel operator when he wanted in or out of his cell. Despite some evidence that Mitchell had been warned not to open plaintiff's cell because there was a rumor that plaintiff would be assaulted in the showers, Mitchell opened plaintiff's cell door three times in the span of a few minutes in response to two different inmates calling out plaintiff's cell number. As a result, the two inmates were able to enter plaintiff's cell and assault him.

Plaintiff sues under 42 U.S.C. § 1983, claiming defendants violated his right under the Eighth Amendment to be free from cruel and unusual punishments. He contends defendants were deliberately indifferent to a substantial risk of harm from inmate assaults. Defendants move for summary judgment on the grounds of qualified immunity.

**II. Uncontroverted facts**

Plaintiff was convicted of thirty-eight counts of sexual exploitation of a child, two counts of indecent liberties with a child between the ages of 14 and 16, and two counts of aggravated indecent liberties with a child under the age of 14. He was previously housed at HCF in Hutchinson. He is currently incarcerated at Ellsworth Correctional Facility (ECF).

Charles Mitchell was a Corrections Officer at HCF on November

4, 2011. Jacob Fears was a Corrections Officer I. Isaac Baker was a Sergeant, and Stephen Jones was a Captain.

Plaintiff first entered Kansas Department of Corrections (KDOC) custody on January 4, 2011. He was transferred to HCF on August 30, 2011.

On November 4, 2011, plaintiff was assigned to general population in C-1 Cell House at HCF. That morning, while he was standing in the breakfast line, plaintiff was assaulted by another inmate, Aaron Wood, who punched him in the jaw. Officers secured both plaintiff and Wood and escorted them to segregation. Soon after, plaintiff signed a protective custody waiver indicating that he was requesting to be released from protective custody back into general population. Plaintiff felt he was not in any further danger at that point because Wood was placed in segregation. Plaintiff understood that he could request placement in protective custody at any time he thought it was necessary.

Plaintiff was released back into general population and was assigned to cell 231 in C-2 Cell House. Baker and Fears were the officers assigned to C-2 on the 3 p.m. to 11 p.m. shift on November 4, 2011. Accompanying them was Mitchell, who was newly hired and who was undergoing on-the-job training. Mitchell's first day at HCF had been October 3, 2011. Although he had undergoing training for about a month, November 4 was the first day he was assigned to C-2 Cell House.

Jones was serving as Shift Commander for the 3 to 11 shift. As such, he was responsible for the day-to-day operation of the entire facility. All uniformed officers reported to him through a series of

intermediaries. The chain of command included two other lieutenants and several master sergeants who had responsibility for specific cell houses.

Fears had worked at HCF for about six months at the time of the November 4 incident. Some time during his shift on November 4,[2] Fears was informed by an inmate that he had overheard some other inmates talk about "handling" plaintiff during showers that evening. The information indicated plaintiff was being targeted because contraband had been found during a recent "shakedown" and some of the inmates thought plaintiff had snitched on them.

Fears completed a list of inmates who had elected to take showers that evening. He learned that plaintiff was not requesting to take a shower.

Before starting the inmate showers, Fears told Mitchell and Baker of a rumor of a possible fight in the showers. Although Baker and Mitchell each testified that Fears only gave them a general warning about a fight in the showers, Fears testified that he informed them the threat was directed at plaintiff.

The control panel that opens and closes the cell doors is at the front end of the cell house. The panel has individual switches for each door that can be set to one of three positions: "on" to open the cell door, "off" to close the cell door, and a middle "neutral" position that allows for a master switch to open or close all doors that are set to neutral. Fears, who was training Mitchell on the

---

[2] Defendants cite an affidavit from Fears stating that he received this information a little before 7 p.m. Doc. 28-4. But in his subsequent deposition Fears could not remember what time it happened.

control panel, testified that he flipped the switch for plaintiff's cell to "off" because he knew plaintiff was not going to take a shower and, as such, there would be no reason to open his cell door. Fears' deposition testimony indicates that he told Mitchell he had done so and told him plaintiff's cell should not be opened. Fears Depo. P. 19.

To the extent there is a difference in recollection and testimony among these defendants as to what was said before the assault, that difference constitutes a genuine issue of fact that only a jury can resolve. In determining whether defendants are entitled to summary judgment, then, the court must adopt the version of the facts most favorable to plaintiff. See Scott v. Harris, 550 U.S. 372, 377 (2007) (on summary judgment, court is required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion; in qualified immunity cases, this usually means adopting the plaintiff's version of the facts). For purposes of summary judgment, then, the court accepts plaintiff's contention that Fears told Mitchell plaintiff had been threatened and that his cell door should not be opened.

The shower area consists of a separate room at the back end of the cell house. During showers, one officer is stationed in the shower room to monitor the inmates and the other officer runs the control panel to let inmates in and out of their cells. Running the control panel can be chaotic, because the officer working that position may have his vision impaired by inmates walking up and down the run, and the officer cannot really see the numbers for the cells. The panel itself is actually behind a wall, and the officer has to lean around the wall to see down the run.

The practice is for inmates returning from showers to simply call out their cell number or otherwise signal to the officer running the panel so the door can be opened and they can return to their cell. There are 25 individual cells on a run, with two runs (the upper 200 and lower 100) on each of the two sides of C2 Cell House.

This was Mitchell's first day in C2 Cell House. He did not know the inmates or in which cells they lived. This was also the first day Fears had worked with Mitchell.

As showers were finishing, Fears left the control panel and C2 Cell House to go tell Captain Jones about the rumored threat against plaintiff. This left Mitchell without supervision to operate the control panel. It was against prison policy to have a trainee without supervision operating the panel, although Mitchell did not know that.

Inmates Shawn Watkins and Jeremy Shuflat were assigned to cells C2-245 and C2-241, respectively, on November 4, 2011. At about 7:23 p.m., Watkins and Shuflat returned form their showers, passing by plaintiff's cell. About 15-20 inmates were out of their cells during this period, going to and from the showers and conversing. It was noisy, there was a lot of inmate movement, and Mitchell had been left to open and close the doors for the 25 cells on the run. After several minutes of speaking with each other, Watkins and Shuflat moved toward the front of the cell house. Watkins raised his hand, motioning towards Mitchell, and called for cell 231 -- plaintiff's cell -- to be opened. There were at least eight other inmates on the 200 run at this time, with several of them between the control panel and Watkins. At about 7:33 p.m., Mitchell opened cell 231, allowing Watkins to enter, and then closed the door. Inside the cell, Watkins assaulted

-6-

plaintiff, although plaintiff was able to subdue him. Shuflat, meanwhile, was outside in the vicinity of the cell. At 7:33:20, Shuflat walked toward the front of the cell house, raised his hand, and called for cell 231 to be opened. Mitchell opened and closed cell 231 at 7:33:34, allowing Shuflat to enter the cell. Inside the cell, Watkins and Shuflat assaulted plaintiff.

After about a minute, Watkins and Shuflat called out for cell 231 to be opened, and they exited the cell when Mitchell opened the door. Plaintiff saw the door closing and attempted to jump through the opening, but the door caught his torso and pinned him momentarily before he was able to work himself free and get outside the cell.

Mitchell did not recognize or find suspicious that he had opened and closed cell 231 three times. During the same time frame, Mitchell opened cell doors for several other inmates along the run. From his vantage point, Mitchell could not see inside plaintiff's cell.

After plaintiff got free of the door, Sergeant Baker was returning from the showers and saw plaintiff sitting or propped up against the railing of the 200 run, with his back toward Baker. As Baker came closer, he saw plaintiff had blood on his face, and he ordered plaintiff to come to the front of the run and radioed Captain Jones to report the situation.

During the attack on plaintiff, Fears was in the rotunda just outside C2 Cell House informing Captain Jones of the rumored threat against plaintiff. Jones was not informed of any risk until the attack was occurring. When Fears reported the threat to him, Jones directed Fears to get with another officer and offer plaintiff protective custody. While this conversation was occurring, a radio call for

assistance from Sergeant Baker occurred. Jones and Fears went to C2 Cell House and found that plaintiff had already been assaulted.

After the assault, there were several inmates in the cell house screaming "cho mo," which is a derogatory term for a child molester.

Plaintiff was immediately escorted to the medical clinic where he received treatment for his injuries.

**III. Discussion**

A. <u>Eighth Amendment standards</u>. The Eighth Amendment imposes a duty on prison officials to protect prisoners from violence at the hands of other inmates. <u>Ramos v. Lamm</u>, 639 F.2d 559, 572-74 (10th Cir. 1980); <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994). To establish an Eighth Amendment violation based on an official's failure to protect, the inmate must show that (1) the alleged deprivation is objectively, sufficiently serious, meaning the inmate is incarcerated under conditions posing a substantial risk of serious harm, and (2) the prison official acted with deliberate indifference, meaning the official knew of and disregarded an excessive risk to the inmate's safety. See <u>Allen v. Zavaras</u>, 430 Fed.Appx. 709, 711 (10th Cir. 2011) (citing <u>Farmer</u>, 511 U.S. 834, 837 and <u>Howard v. Waide</u>, 534 F.3d 1227, 1236 (10th Cir. 2008)). An official disregards a known risk by failing to take reasonable measures to abate it. Prison officials cannot be held liable where they know of a risk to inmate safety and respond reasonably to it. <u>Farmer</u>, 511 U.S. at 844.

To violate the Cruel and Unusual Punishments Clause of the Eighth Amendment, a prison official must have a sufficiently culpable state of mind. <u>Farmer</u>, 511 U.S. at 834. The deliberate indifference standard lies "somewhere between the poles of negligence at the one end and

-8-

purpose or knowledge at the other." Farmer, 511 U.S. at 836. It requires "more than ordinary lack of due care for the prisoner's interests or safety," but does not require a showing that acts or omissions were done for the very purpose of causing harm or with knowledge that harm will result. Farmer, 511 U.S. at 835 (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). The standard is equivalent to recklessness in the criminal law, under which a person is liable only when he disregards a risk of harm of which he is aware.

    B. Qualified immunity standard. The Tenth Circuit recently noted as to qualified immunity: When a defendant moves for summary judgment on the basis of qualified immunity, the burden shifts to the plaintiff to demonstrate, on the facts alleged, that (1) the defendant violated his constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged unlawful activity. Castillo, 790 F.3d at 1019 (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Anderson v. Creighton, 483 U.S. 635, 640 (1987). In other words, in the light of pre-existing law the unlawfulness of the official's actions must be apparent. Id. If the plaintiff cannot meet either part of this burden, the defendant is entitled to qualified immunity. Id. (citing Swanson v. Town of Mountain View, 577 F.3d 1196, 1199 (10th Cir. 2009)).

    The law has long been that prison officials have a duty to protect prisoners from violence at the hands of other prisoners, and that a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment. Farmer,

511 U.S. at 833. It was clearly established law at the time of this incident that an inmate had an Eighth Amendment right to be reasonably protected from threats of violence from other inmates. See e.g., Dantrassy v. Van Hoesen, 398 Fed.Appx. 368, 2010 WL 3995975 (10th Cir. 2010); Mervin v. Furlong, 2000 WL 248472, *2 (10th Cir., Mar. 6, 2000) ("The law is well settled that the Eighth Amendment requires prison officials to 'take reasonable measures to guarantee the safety of the inmates.'"); Ross v. Addison, No. CIV-13-323-R, 2015 WL 237190, at *5 (W.D. Okla. Jan. 16, 2015) (citing Tenth Circuit and U.S. Supreme Court cases for the proposition that "it was clearly established in 2011, when the alleged constitutional violations occurred, that 'an inmate has an Eighth Amendment right to be protected against prison guards taking actions that are deliberately indifferent to the substantial risk of [violence] by fellow prisoners.'").

    C. Mitchell.

Mitchell first argues that he was not deliberately indifferent because the evidence shows he did not perceive that plaintiff was at risk of any harm. Doc. 90 at 14. The record shows a genuine issue of fact, however, at least initially, because Fears testified that he specifically told Mitchell a threat had been made against plaintiff and that his cell door should not be opened. Mitchell denies having been told that, but if a jury were to credit Fears' testimony, it could reasonably find that Mitchell was aware that plaintiff was at risk of harm from assault by other inmates if his cell door were to be opened.

Mitchell next claims he was not deliberately indifferent to plaintiff's safety because he did not intentionally allow any other

-10-

inmates to enter plaintiff's cell. In response, plaintiff argues that Mitchell's state of mind is a question of fact to be proven by circumstantial evidence and that Fears' testimony is sufficient to raise a genuine issue on that point. But plaintiff also concedes that "[t]rainee Mitchell did not recognize or find suspicious that he had opened and closed cell 231 three times." Plaintiff does not explain how this undisputed fact jibes with his claim that Mitchell was deliberately indifferent to a known risk. Moreover, it is undisputed that this was Mitchell's first day in C2 Cell House, that he did not know the inmates or the cells in which they lived, and that the standard practice at HCF was for inmates to call out their cell numbers to the panel operator. Even though Mitchell had been made aware of a threat to plaintiff, the threat was ostensibly neutralized because, as Fears informed him, plaintiff was locked in his cell and was not planning on taking a shower. Cf. Farmer, 511 U.S. at 844 (official not liable if he "believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."). Unfortunately, Mitchell proceeded to revive the risk by opening plaintiff's cell door, but on this record the only reasonable inference is that he did so unwittingly and without realizing that it was plaintiff's cell. "To violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind.'" Farmer, 511 U.S. at 834. It may have been negligence for Mitchell to open the cell door without first verifying which cell was plaintiff's, but negligently subjecting an inmate to a risk of harm is not sufficient to support a claim. See Farmer, 511 U.S. at 835, 837 (Eighth Amendment liability requires more than ordinary lack of care

for the prisoner's safety); Rider v. Werholtz, 548 F.Supp.2d 1188, 1197 (D. Kan. 2008) (plaintiff's allegations "constitute claims that guards were negligent in permitting other inmates access to his pod" and were therefore not actionable).

Plaintiff cites no evidence that could reasonably support an inference that Mitchell consciously subjected him to a risk of harm. Cf. Cantu v. Jones, 293 F.3d 839, 844 (5th Cir. 2002) (deliberate indifference was issue for the jury where guards left doors open that allowed one inmate to attack another; chain of unusual circumstances suggested prison officials wanted to punish plaintiff for his prior complaints). Under the circumstances, Mitchell is entitled to judgment on grounds of qualified immunity, because the uncontroverted facts do not show that his actions violated plaintiff's Eighth Amendment rights. Farmer, 511 U.S. at 838 ("an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

    D. Fears.

Fears argues he was not deliberately indifferent because he believed there was no risk as long as plaintiff was locked in his one-man cell. Moreover, he argues that he took reasonable steps to address any risk. Doc. 90 at 15-16. In response, plaintiff argues that Fears had knowledge of the risk to plaintiff and ignored it by failing to interview plaintiff, by waiting 45 minutes to report the threat to Jones after having set plaintiff's cell door control to "off," and by leaving trainee Mitchell in charge of the control panel. Doc. 94 at 19-20.

Fears was aware of a risk to plaintiff's safety, but on this record there is no evidence that he was deliberately indifferent to it. To show deliberate indifference, plaintiff "must establish that defendant(s) knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" Hunt v. Uphoff, 199 F .3d 1220, 1224 (10th Cir.1999) (quoting Farmer, 511 U.S. at 847). The uncontroverted facts show that Fears took several reasonable steps to address the risk to plaintiff, including warning Mitchell and Baker, determining that plaintiff planned to stay in his cell that evening, ensuring that the control knob for plaintiff's cell was set to "off," and reporting the threat to Captain Jones. Each of the foregoing was responsive to the threat to plaintiff and was designed to lessen the risk of plaintiff being harmed. Taking such reasonable steps in response to the rumor that plaintiff would be assaulted precludes any finding that Fears violated plaintiff's Eighth Amendment rights, even if the steps taken by Fears were ultimately unsuccessful. Farmer, 511 U.S. at 847 ("a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."). The court finds that under these facts Fears is entitled to qualified immunity.

E. Baker.

Baker, like Mitchell, testified that he only remembers a general warning about a possible fight in the showers on the evening of November 4, 2011. But based on Fears' testimony, a jury could reasonably find that Fears told Baker and Mitchell that there had been

-13-

a threat to "handle" plaintiff in the showers that evening and that his cell should not be opened. Nevertheless, the evidence fails to show that Baker was deliberately indifferent to any risk to plaintiff's safety.

Given Fears' actions outlined above, Baker had no reason to believe that plaintiff's safety was at risk. When Baker left after meeting with Fears and Mitchell, plaintiff was securely locked in his cell. He had no plans to leave the cell that evening. Fears had indicated his cell should not be opened, and Fears was supervising Mitchell at the control panel. Baker's assignment at that point was to monitor the inmates in the showers at the other end of the cell house. Baker simply had no reason to believe plaintiff was at risk at that point and he cannot be said to have shown deliberate indifference to a risk of harm.

Plaintiff faults Baker for "not properly supervis[ing] Mitchell's training" at the control panel and for not reporting the threat to Captain Jones sooner. But neither of these allegations will support a claim for cruel and unusual punishment, even if Baker could have done a better job of supervising, or if he could have required Fears (who had obtained the information about a possible assault) to report the threat sooner. Any threat to plaintiff when Baker went to the showers appeared to have been abated, and the high standard of culpability required for an Eighth Amendment claim is not satisfied by Baker's failure to foresee that Mitchell would be left unsupervised at the control panel and would inadvertently open plaintiff's cell door to other inmates. Again, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no

cause for commendation, cannot under our cases be condemned as the infliction of punishment." Farmer, 511 U.S. at 838. Plaintiff has failed to cite evidence from which a jury could find that Baker violated his right not to be subjected to cruel and unusual punishment. Accordingly, Baker is entitled to summary judgment.

F. Jones.

Plaintiff concedes that Captain Jones did not learn of the threat to plaintiff's safety until plaintiff had already been attacked by the other inmates. Doc. 94 at 22. It was clearly too late at that point for Jones to do anything to prevent the attack. Plaintiff nevertheless argues that Jones violated his Eighth Amendment rights because it was Jones' duty to see that Mitchell had been adequately trained and to ensure that the other officers followed proper procedures. Doc. 94 at 22-23.

Plaintiff's general allegation of poor supervision comes nowhere close to establishing any basis for imposing liability on Jones. In the first place, Jones bears no supervisory liability when the acts of his subordinates have not been shown to violate plaintiff's rights. See Serna v. Colo. Dep't. of Corr., 455 F.3d 1146, 1151 (10th Cir. 2006) ("In order to establish a §1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must first show [that] the supervisor's subordinates violated the constitution."). Nor has plaintiff pointed to any evidence that could support liability based on some unlawful policy by Jones. Plaintiff alleges no particular policy by Jones that caused the alleged violation, no evidence that Jones was aware of a risk to plaintiff's safety from the policy, and no evidence that Jones was deliberately

indifferent to a risk to plaintiff's safety. Cf. Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010) (a defendant-supervisor may be found liable if (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation). Under the uncontroverted facts Jones is likewise entitled to summary judgment.

## IV. Conclusion

The motion for summary judgment by defendants Mitchell, Fears, Baker and Jones (Doc. 89) is granted. A judgment dismissing all claims will be entered in favor of defendants.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed three double-spaces pages and shall strictly comply with the standards annunciated by this court on Comeau v. Rupp, 810 F.Supp. 1172, 1174 (D. Kan. 1992). The response to any motion for reconsideration shall not exceed three double-spaced pages. No reply shall be filed.

The court expresses its thanks to Ms. Couch and Mr. Michel, who agreed to accept an appointment in this matter and who have ably represented plaintiff's interests. In accordance with D. Kan. R. 83.5.3(e)(2) & (f), they may submit an appropriate claim to recover any unreimbursed out-of-pocket expenses incurred in the representation. They may also be excused from further representation by filing an appropriate motion to withdraw.

IT IS SO ORDERED.

Dated this 10th day of September 2015, at Wichita, Kansas.

                                              <u>s/Monti Belot                   </u>

                                              Monti L. Belot

                                              UNITED STATES DISTRICT JUDGE